IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL CASE NO. 5:10CV195-RLV

DANIEL W. SALMONS,  )
        Plaintiff/Claimant,  )
          )
v.  )  **Memorandum and Order**
          )
MICHAEL J. ASTRUE,  )
Commissioner of Social Security,  )
        Defendant/Commissioner.  )
          )

**THIS MATTER** is before the Court on the parties' cross-motions for summary judgment (Documents ##15-17) and upon the Memorandum and Recommendation of United States Magistrate Judge David C. Keesler (the "Magistrate Judge"). (Document #18)

Pursuant to 28 U.S.C. § 636(b)(1)(B), the Magistrate Judge was designated to consider and recommend disposition. In an opinion filed August 31, 2011, the Magistrate Judge recommended that Plaintiff's Motion for Summary Judgment be denied, that Defendant's Motion for Summary Judgment be granted, and that the Commissioner's decision be affirmed. (M&R at 10.) Plaintiff, through counsel, timely filed Objections to the Memorandum and Recommendation on September 14, 2011. (Document #19) The Commissioner filed a reply brief on September 29, 2011. (Document #21)

**I.**

The Federal Magistrate Act provides that "a district court shall make a *de novo* determination of those portions of the report or specific proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983); Keeler v. Pea, 782 F. Supp. 42, 43 (D.S.C. 1992). The statute does not require *de*

*novo* review when an objecting party makes only general or conclusory objections that do not direct the court to the specific error in the magistrate judge's recommendations. *See* Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315-16 (4th Cir.2005); Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Further, the statute does not on its face require any review at all of issues that are not the subject of an objection. Thomas v. Arn, 474 U.S. 140, 149 (1985); Camby, 718 F.2d at 200. Nonetheless, a district judge is responsible for the final determination and outcome of the case, and accordingly the Court has conducted a careful review of the Magistrate Judge's Memorandum and Recommendation as well as a *de novo* review of the matters specifically raised in Plaintiff's Objections.

## II.

Plaintiff Salmons' Objection to the Magistrate Judge's Memorandum and Recommendation relates to a single determination, namely, whether substantial evidence supports the Commissioner's finding that Salmons does *not* satisfy Listing 12.05C (or §12.05C) for mental retardation at Step Three of the sequential evaluation process.

As set forth in the introductory paragraph of Listing 12.05, in order to be found disabled under any specific §12.05 listing, a claimant must first establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" (*i.e.*, prior to age 22) [Prong 1]. 20 C.F.R. pt. 404, subpt. P, app. 1, §12.05. In addition, a claimant must meet one of the four requirements described in subparagraphs A through D of §12.05. Id. Relevant here is §12.05C, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 [Prong 2] and a physical or other mental impairment imposing an additional and significant work-related limitation of function [Prong 3]." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C; *see also* Hancock v. Astrue, 667 F.3d 470,

473 (4th Cir.2012). The parties agree that the requisite 12.05C IQ criteria is satisfied as well as the additional work-related limitation criteria.[1]

On appeal, the Court considers whether substantial evidence supports the Commissioner's denial of benefits based upon the alleged lack of evidence demonstrating "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." (M & R, 7.)

"Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below." Norris v. Astrue, 2008 WL 4911794, *3 (E.D.N.C. Nov. 14, 2008) (*unpublished*). While "intellectual functioning" is determined by standardized intellectual quotient (or "IQ") testing[2], "[a]daptive functioning refers to how effectively an individual copes with common life demands and how well [he] meets the standards of personal independence expected of someone in [his] particular age group, sociocultural background, and community setting." Caldwell v. Astrue, 2011 WL 4945959, *3 (W.D.N.C. October 18, 2011) (Reidinger, J.) *(quoting Diagnostic and Statistical Manual of Mental Disorders* ("DSM") (4th ed. text rev. 2007)).[3] Examples of

---

[1] Plaintiff has at least one IQ score between 60 and 70. In addition, Plaintiff's Axis III Seizure Disorder diagnosis, which "need not be disabling in and of itself," satisfies the "physical or other mental impairment imposing an additional and significant work-related limitation of function" requirement. Luckey v. U.S. Dept. of Health and Human Servs., 890 F.2d 666, 669 (4th Cir.1989) (*quoting* Branham v. Heckler, 775 F.2d 1271, 1273 (4th Cir.1985)). Plaintiff was also diagnosed with dysthymia, a mild, but chronic, form of depression.

[2] *See* Norris v. Astrue, 2008 WL 4911794, *3 n. 2 (E.D.N.C. Nov. 14, 2008) (*unpublished*) ("General intelligence functioning is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests (*e.g.*, Wechsler Intelligence Scales for Children, 3rd Edition; Stanford-Binet, 4th Edition; Kaufman Assessment Battery for Children).") (*internal citations omitted*).

[3] The federal regulations explicitly allow the Social Security Administration to rely on the DSM, and other professional standard measures, such as the Vineland Adaptive Behavior Scales or the American Association on Mental Retardation Adaptive Behavior Scale, in assessing a claimant's adaptive functioning. *See* Caldwell, 2011 WL 4945959, *3 n. 1 (*citing* 67 Fed.Reg. at 20,022.)

"[d]eficits in adaptive functioning [may] include limitations in areas such as communication, self-care, home living, social / interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." Jackson v. Astrue, 2012 WL 580239, *3 (4th Cir. 2012) (*unpublished*) (*citing* Atkins v. Virginia, 536 U.S. 304, 309 n. 3 (2002)); Caldwell, 2011 WL 4945959, *3 (*internal citation omitted*).

In his Objections, Plaintiff, through counsel, contends that the Magistrate Judge erred procedurally (a) "in failing to acknowledge" and apply binding circuit precedent determinative of Listing 12.05C's second criteria, Luckey v. U.S. Dept. of Health and Human Servs., 890 F.2d 666, 667 (4th Cir.1989); and (b) "in finding that Plaintiff has engaged in various activities that are incompatible with deficits in adaptive functioning." (Pl.'s Objs. 3, 6)

### A. Luckey Is Authoritative But Not Determinative

In Luckey v. U.S. Dept. of Health and Human Services, the Fourth Circuit considered a Listing 12.05C issue where the only IQ evidence was from a test administered to the claimant in conjunction with the application process for disability benefits. Luckey had only completed the fifth grade and could "barely read or write," yet had been able to work "60 to 80 hours per week in a country grocery store as a short-order cook and cashier" for over twenty years prior to seeking disability benefits after onset of a physical impairment. Luckey, 890 F.2d at 667. Testing indicated that Luckey had an IQ of 68, which met Listing 12.05C. Luckey was described as ***"functioning in the borderline to mildly retarded range."*** Luckey, 890 F.2d at 668 (*emphasis added*). The Luckey court, which did not mention school records, discussed various reasons why an adult might not have undergone IQ testing earlier in life. Luckey, 890 F.2d at 667. The court emphasized that the Secretary's regulation "expressly define[s] mental retardation as denoting 'a lifelong condition.'" Luckey, 890 F.2d at 667 (*quoting* Branham v. Heckler, 775

F.2d 1271, 1274 (4th Cir.1985)).  For this reason, "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant."  <u>Luckey</u>, 890 F.2d at 668 (*citing* <u>Branham</u>, 775 F.2d at 1274).  With respect to early onset, the Commissioner argued that Luckey's prior work history weighed against a finding that his low IQ manifested during his developmental years (*i.e.*, that deficits in adaptive behavior existed prior to adulthood). The <u>Luckey</u> panel rejected this argument and explained that the Commissioner "may not rely upon previous work history to prove non-disability where the Section 12.05C criteria are met."  <u>Luckey</u>, 890 F.2d at 669 (*citing* <u>Murphy v. Bowen</u>, 810 F.2d 433, 438 (4th Cir.1987)).  Applying these principles in <u>Luckey</u>, the Fourth Circuit held that "the evidence that [Luckey] could barely read or write was "a clear 'manifestation' of mental retardation occurring before age twenty-two."  <u>Luckey</u>, 890 F.2d at 668-69 (*quoting* <u>Turner v.Bowen</u>, 856 F.2d 695, 699 (4th Cir.1988)). The Commissioner's denial of benefits was reversed and the case remanded with instructions to award benefits.

According to Plaintiff, <u>Luckey</u> stands for the proposition that "absent evidence of a change in IQ, evidence of a claimant's ability to only barely read or write is, ***on its own***, evidence enough to establish deficits in adaptive functioning initially manifested during the developmental period" as a matter of law.  (Pl.'s Obj. 3) (*emphasis added*). The Commissioner contends that because <u>Luckey</u> failed to address deficits in adaptive functioning before age 22, it is inapposite.  Whether <u>Luckey</u> can be read as broadly as Plaintiff proposes, or as strictly as the Commissioner suggests, is doubtful on both counts.

Listing 12.05C has been amended since <u>Luckey</u> was decided. As described by the Commissioner, in 2000, Section 12.05 was amended in part to clarify that a claimant will meet the listing for mental retardation only if the "[claimant's] impairment satisfies the diagnostic

description in the introductory paragraph [to Listing Section 12.05]." (Def.'s Response to Pl.'s Objs., at 2) Since that time, the Fourth Circuit has neither expressly overruled Luckey nor addressed Luckey's continued applicability.[4] When Luckey was decided in 1989, courts generally treated the §12.05C analysis as only a two-part inquiry whereas now §12.05C is considered a three-part test. *See* Luckey, 890 F.2d at 668-69 (applying 1988 version of §12.05C listing); *compare* Flowers v. Dept. of Health and Human Servs., 904 F.2d 211, 213 (4th Cir.1990) (holding that §12.05C had only two requirements) *with* Jackson, 2012 WL 580239, *3 (describing IQ and presence of an additional work-related impairment as the "first two prongs of Listing 12.05C" while identifying the "deficits-in-adaptive-behavior requirement" as the final question) *and* Hancock, 667 F.3d at 473. Regardless of its description as a two or three-part test, the plain language of the regulation (both in 1988 and at present), as well as the case law, make clear to the undersigned that deficits in adaptive functioning prior to age 22 have always been an important aspect of the §12.05C inquiry. In fact, the Luckey panel defined its first issue as "whether Luckey's low IQ manifested itself in deficits in his adaptive behavior before age 22 ...." Luckey, 890 F.2d at 668. Consequently, the amendment to Listing 12.05C does not render Luckey entirely without precedential value as suggested by the Commissioner. Indeed, the

---

[4] Luckey was decided in 1989. "In 1992, the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with a limited intellectual functioning." Hatfield v. Astrue, 2008 WL 4449948, *6 n. 5 (S.D.W.Va. September 29, 2008) (*quoting The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed.1999)). Therefore, according to at least one medical source, "[c]lassification based on IQ alone has been replaced to that based on level of support needed." Id. The Merck Manual of Diagnosis and Therapy now defines mental retardation as follows:

> "Significantly subaverage intellectual quotient with **related limitations in two or more** of the following: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work."

Hatfield, 2008 WL 4449948, *6 (*internal citation omitted*) (*emphasis added*). According to The Merck Manual, a mental retardation diagnosis must be supported by related limitations in two or more areas, one of which may include functional academics.

Luckey holding, and a claimant's inability to read and write, continues to be cited as probative of the extent a claimant experienced deficits of adaptive functioning prior to the age of 22. *See e.g.*, Holtsclaw v. Astrue, 2011 WL 6935499 (W.D.N.C. December 30, 2011) (Reidinger, J.) (reversing Commissioner's denial of benefits as to Listings 12.05B and C pursuant to Luckey, stating "Plaintiff's extremely low IQ scores, coupled with her lack of literacy and history of special education, are sufficient to establish the requisite manifestation of deficits in adaptive functioning before the age of 22."); *see also* Rivers v. Astrue, 2011 WL 2581447, *3-4 (D.S.C. June 28, 2011) (remanding after Commissioner denied benefits to claimant under §12.05C, finding that evidence existed in the record to demonstrate an onset of the impairment before age 22 where there was evidence of illiteracy and no evidence that claimant's IQ had changed). Therefore, Luckey is still authoritative.

Under Luckey and Branham, the Court may presume that Plaintiff's IQ prior to age 22 was the same or approximately the same as that revealed in testing administered in connection with the disability application as long as there is no evidence to indicate a change in intellectual functioning. Luckey, 890 F.2d at 668; Branham, 775 F.2d at 1274 (*citing* Mitchell v. Schweiker, 699 F.2d 185, 188 (4th Cir.1983)). Where the evidence of intellectual functioning is inconsistent, however, the medical expert may properly evaluate the IQ scores and other evidence of record in order to reach factual conclusions about the relative merit of the tests performed and whether the record supports a finding of mental retardation. *See* Weaver v. Astrue, 2010 WL 1947216, *5, n.6 (M.D.N.C. May 13, 2010) (distinguishing Luckey based upon inconsistent evidence of intellectual functioning in the record, including some IQ scores that met 12.05B Listing and some that did not); Guiton v. Astrue, 2012 WL 1267856, *2 (M.D.N.C. April 16, 2012) (Luckey did not apply, and claimant did not satisfy "onset" prior to age 22 standard, where medical

expert opined that the subsequent lower IQ scores were more than likely due to negative impact from claimant's brain tumors and resultant surgeries). Moreover, the ALJ "has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only [IQ score] in the record." Hancock, 667 F.3d at 474-75 (ALJ properly discredited only IQ result of record where the examiner did not attest to the validity of the test scores and given that IQ scores were inconsistent with the claimant's actual functioning and notes of treating psychiatrists).

In this case, there is inconsistent evidence regarding Plaintiff's intellectual functioning and attendant diagnoses. In 2009, intelligence quotient testing administered by Richard Welser, Ph.D. ("Dr. Welser") (*i.e.*, Wechsler Adult Intelligence Scale - Third Edition (WAIS-III)) revealed a Full Scale IQ of 65 [Verbal - 66; Performance - 69]. (Exh. 3F, 3 / Tr. 287) Significantly, Dr. Welser opined that Plaintiff's IQ scores, "regarded as valid and reliable," were "grossly consistent with that which might be expected for an individual with a 9th grade special education." (Exh. 3F, 4 / Tr. 288) Plaintiff "exhibited no gross cognitive dysfunction" and "[h]is level of insight and judgment were estimated to be in the fair range." (Exh. 3F, 3 / Tr. 287) Dr. Welser concluded that, overall, Plaintiff's test results indicate that he would experience "difficulty comprehending and performing complex work and ***life-related responsibilities***." (Exh. 3F, 4 / Tr. 288) (*emphasis added*). Nonetheless, Dr. Welser opined that the claimant was able to sustain attention to perform "simple repetitive tasks." (Exh. 3F, 4 / Tr. 288) Dr. Welser diagnosed Plaintiff with "mild mental retardation." (Exh. 3F, 4 / Tr. 288) Dr. Welser's psychological findings were attributed significant weight by the ALJ. (Tr. 20)

Although not discussed by Dr. Welser, Lori Brandon Souther, Ph.D. ("Dr. Souther"), mentions IQ testing administered by Dr. Welser in 2004 in her notes concerning Plaintiff's

mental functional capacity.[5] (Tr. 302) The 2004 Full Scale IQ score was slightly higher than the 2009 score – Full Scale IQ - 70 [Verbal - 75; Performance - 70] – but still within the Listing 12.05C range of 60 to 70. At that time, IQ testing did not trigger a diagnosis for mild mental retardation as Dr. Welser apparently originally considered Plaintiff within the borderline intellectual functioning category. (Exh. 1F, 5 / Tr. 268)

Here, the only medical expert to recognize the inconsistent IQ scores was Dr. Souther.[6] Dr. Souther, who did not examine or treat Plaintiff, opined that "there is no support for [a finding of] lifelong MR [mental retardation]." (Tr. 291) Dr. Souther acknowledged Dr. Welser's more recent diagnosis of mild mental retardation and the fact that current IQ scores were in the 60s, but concluded that the "history is more supportive of BIF[borderline intellectual functioning]." (Tr. 302) According to Dr. Souther, one possible explanation for the discrepancy between the IQ scores obtained in 2004 and 2009 could be attributed to Plaintiff's history of seizures. (Tr. 302) ("Hx[history] of seizures could impact cognitive function to some degree ....")

Dr. Welser's 2009 report of evaluation, which was relied upon by the ALJ and attributed significant weight, does not attempt any reconciliation of the 2004 and 2009 diagnoses and IQ scores. In addition, the ALJ failed to identify the discrepancies or explain whether he agreed with Dr. Souther concerning the potential impact of seizures on Plaintiff's cognitive functioning. *See e.g.,* Hancock, 667 F.3d at 474-75. The fact that neither Dr. Welser nor the ALJ addressed these prior IQ scores weighs in favor of remand. (*See* Section "II, D")

---

[5] Dr. Welser tested Plaintiff previously, presumably, in connection with the original application for disability benefits which alleged an earlier onset date. (Exh. 1F / Tr. 268-70) (Plaintiff's alleged onset date was amended from October 12, 2003 to January 1, 2009.)

[6] Two additional assessments of Plaintiff's mental functional capacity support Plaintiff's ability to perform "simple, routine, repetitive tasks." (Tr. 20) (Lori Brandon Souther, Ph.D. and Jonathan Mayhew, Ph.D.) The ALJ attributed significant weight to these consulting experts' assessments because he determined them to be "consistent with the overall evidence in the record." (Tr. 20)

**C. Substantial Evidence Does Not Exist In The Record To Support The ALJ's Findings Concerning The Absence Of Deficits In Adaptive Functioning Prior To Age 22**

The decision in this case turned on the ALJ's determination that there was "nothing to indicate that [Plaintiff's] intellectual limitations were at listing level prior to age 22 other than his own testimony." (Tr. 20) The ALJ found that Plaintiff fell into the borderline intellectual functioning category instead of mild mental retardation under Listing 12.05C. (Tr. 14, 19) Plaintiff objects, emphasizing that Listing 12.05C is designed for claimants with "mild" mental (as opposed to moderate, severe, or profound) retardation. (Pl.'s Objs. 6-8) In support, Plaintiff argues that certain activities cited by the ALJ as "incompatible with deficits in adaptive functioning" are "quite compatible with the general abilities of persons with mild mental retardation, as specified by the diagnostic standards of the DSM-IV-TR.")[7] (Pl.'s Objs. 8) The Court turns now to adaptive functioning, which entails a fact-intensive inquiry concerning the ability of the claimant to cope with common life demands and achieve certain standards of personal independence. To this end, a review of other Listing 12.05C cases is instructive.[8]

**1. Illustrative Listing 12.05C Cases**

In Holtsclaw v. Astrue, the district court determined that substantial evidence did *not* exist in the record to support the Commissioner's finding that Holtsclaw was unable to meet her

---

[7] The ALJ did not explain how Plaintiff's claim of "mild" retardation, DSM-IV-TR, would affect the Plaintiff's burden as to deficits in adaptive functioning, if at all. The Magistrate Judge and ALJ both cited evidence that Plaintiff retains the ability to "do household chores, shop for food and clothes, pay bills, take care of personal grooming and hygiene, use a telephone, do yard work, and is not significantly limited in his ability to travel in unfamiliar places or to use public transportation." (M & R, 9) (*citing* Tr. 15-16, 19-20) The Sixth Circuit has held that the following activities are not necessarily "inconsistent with a valid test IQ of 68": use of public transit, making change at a grocery store, doing laundry (but with strong body odor), cleaning, limited reading comprehension (equivalent to a third-grade education), or the ability to keep records of work activity. *See* Dragon v. Comm'r of Social Sec., 2012 WL 987758, *7 (6th Cir. 2012) (*citing* Brown v. Sec'y of Health & Human Servs., 948 F.2d 268, 270 (6th Cir.1991)).

[8] In each instance, the ALJ considered diagnoses of borderline to mild mental retardation and the record evidence concerning the claimant's deficits in adaptive functioning.

burden of establishing deficits in adaptive functioning before age 22. Holtsclaw v. Astrue, 2011 WL 6935499 (W.D.N.C. December 30, 2011) (Reidinger, J.). In Holtsclaw, the claimant had a Full Scale IQ of 59 [verbal IQ - 63; performance IQ - 60], was in special education classes, had a learning disability and a history of poor academic performance, was illiterate, and dropped out of school in the 11th grade. Holtsclaw, 2011 WL 6935499, *4 (district court found there was an abundance of evidence of deficits in adaptive functioning before age 22). Holtsclaw never lived independent of her family of origin and required a parent's help to understand and complete the disability benefit application and related forms. Holtsclaw, 2011 WL 6935499, *4-5 (substantial evidence existed in the record of deficits in adaptive functioning in the area of social functioning).

Similarly, in Rivers v. Astrue, the case was remanded and benefits awarded under §12.05C following the Commissioner's denial of benefits for lack of evidence of onset of impairment before age 22. Rivers, 2011 WL 2581447, *3-4. The district court found that substantial evidence existed in the record to demonstrate an onset of the impairment before age 22 where the claimant was found to be functionally illiterate and deficits in adaptive functioning included special needs classification at school, repetitive evaluation in first three years of education, school records indicated the claimant was "inattentive with marked aggressiveness and speech defect," third grade IQ testing resulted in Full Scale IQs of 53, 59, and 53, the claimant dropped out of school in the ninth grade, and subsequently obtained a GED while in the Job Corps. Rivers, 2011 WL 2581447, *3.

In contrast is Caldwell v. Astrue, where the ALJ found that the claimant was "not really deficient with regard to adaptive functioning." Caldwell v. Astrue, 2011 WL 4945959, *3 (W.D.N.C. October 18, 2011) (Reidinger, J.) The Caldwell claimant could not read or write, had

attended special education classes in school, and appeared unable to manage his own finances. However, the record included evidence that Caldwell had "good communication, self-care home care skills" and "social / interpersonal skills." Caldwell, 2011 WL 4945959, *3. Caldwell was "capable of using community resources and helping his sister to care for his elderly mother"; plaintiff was "capable of simple, routine, repetitive tasks" and prepared his own breakfast, did his own laundry, changed his bed, swept the floor, vacuumed; plaintiff spent social time with his family, went out to eat with friends, and had no difficulties relating to others, including coworkers and supervisors. Caldwell, 2011 WL 4945959, *4. In that instance, the Commissioner's denial of benefits was affirmed by the district court on the basis that Caldwell had a higher adaptive functioning than IQ scores suggested. Caldwell, 2011 WL 4945959, *4.

In Hancock v. Astrue, the Fourth Circuit affirmed the Commissioner's denial of benefits on the basis of higher adaptive functioning than IQ scores suggested where there was evidence that the claimant essentially managed the household, was able to care for three young children at a level of care acceptable to the Department of Social Services, and was in school pursuing a GED. Hancock, 667 F.3d at 474-75. In Hancock, there were also questions about the validity of the IQ testing as well as three other opinions that the claimant was capable of more than the testing indicated. Id.

### 2. Evidence Concerning Plaintiff's Adaptive Functioning

The evidence concerning Plaintiff's adaptive functioning highlights the significance of the weight attributed by the ALJ to a given piece of evidence. *See e.g.*, Hancock, 667 F.3d at 476 (*internal citations omitted*); Norris, 2008 WL 4911794, *3 (mental retardation diagnosis possible with IQs between 70 and 75 with significant deficits in adaptive behavior; but diagnosis may not be supported with IQs below 70 without significant deficits).

As gleaned from the cases, functional academic skills is the primary measure of deficits of adaptive functioning before age 22. Here, similar to Holtsclaw and Rivers, there is evidence that Plaintiff Salmons experienced deficits in functional academic skills prior to age 22. At the administrative hearing before the ALJ, Plaintiff testified that he went no further than the ninth grade in school, that he was in Special Education classes, and that his teachers "taught [him] the basics" so he could pass the grade. (Tr. 36) Plaintiff explained that he has difficulty reading and writing but can do most "basic math" (*i.e.*, adding and subtracting simple figures; uses his fingers to add and subtract large numbers). (Tr. 37-39) Although Plaintiff's cumulative childhood academic records were not able to be located, the only available records are in line with Plaintiff's testimony.[9] (Tr. 257) In fact, Plaintiff testified that he had to repeat the seventh grade and at least one other grade. (Tr. 36-37) The only record produced is a first quarter report card for seventh grade in the Burke County (NC) Public Schools. (Tr. 258) Plaintiff's report card shows failing marks ("Fs") for both Language Arts and Mathematics and "Ds" for Social Studies, Science, and Occupational Exploration, and a "C" in Physical Education. (Tr. 258-59) Although the ALJ questioned Plaintiff's testimony concerning earlier deficits, Dr. Welser opined that Plaintiff's IQ scores were "grossly consistent with that which might be expected for an individual with a 9th grade special education." (Exh. 3F, 4 / Tr. 288) In addition, Dr. Welser explained that Plaintiff, like the Luckey claimant who could "barely" read or write, "is not able to read and write adequately." (Exh. 3F, 4 / Tr. 288)

According to the ALJ, Plaintiff experiences only "mild" restrictions in his daily activities. (Tr. 16) However, evidence relevant to Plaintiff's level of personal independence

---

[9] The Plaintiff's family moved numerous times during his primary school years. (Tr. 262) Handwritten notes on the records produced mention three different middle schools. Information obtained by Plaintiff from the Goose Creek Consolidated Independent School District in Baytown, Texas, indicates that the school district was only required to retain the records for seven years and that the cumulative records "may have been destroyed, or forwarded to another school district." (Tr. 257)

does not appear to support this finding. Plaintiff lives with his mother and has done so for the last "couple of years."[10] (Tr. 32) While Plaintiff's mother indicated that Plaintiff had "no difficulties with self-care" (personal hygiene, etc.), Plaintiff – who is forty-two years old – is heavily dependent on his mother. (Exh. 6E) When asked at the hearing, "[W]ho does the household chores, cooking and cleaning and so forth," Plaintiff answered, "My mother." (Tr. 32) Plaintiff testified that he helped some by washing dishes or vacuuming and spent time during the day "trying to help [his] mother clean up or clean [his] room up or try[ing] to find ... something outside [*i.e.*, in the yard] to do for a little while." (Tr. 32-33) Further, Plaintiff does not drive but relies instead on his mother and others for transportation. (Tr. 33) Plaintiff is not responsible for providing care or supervision for anyone else.

Plaintiff's social functioning was found to be relatively high. According to Dr. Welser, Plaintiff reported having no difficulties relating to others, including co-workers or supervisors. (Exh. 3F, 3 / Tr. 286) Plaintiff goes "with his mother sometimes shopping," has "a lady friend that comes over and gets [him] too[sic] for a cookout on the weekends sometimes, and also has "a sister that comes over sometimes." (Tr. 33 / Exh. 6E) Nonetheless, Plaintiff was deemed to have "marked" difficulties with regard to concentration, persistence, or pace. (Tr. 16)

Arguably, Plaintiff is not as high-functioning as the claimants in Caldwell (who assisted with the care of an elderly parent) and Hancock (who provided child care for three small grandchildren). Like the claimant in Holtsclaw, Plaintiff testified that he had to solicit help from his mother to fill out the forms for his application for disability benefits. (Tr. 38-39) Plaintiff likewise told Dr. Welser that he "had to have help" remembering the date of his testing

---

[10] The record does not indicate whether Plaintiff lives with his mother because he has deficits in adaptive functioning and is unable to live independently, or for some other reason such as financial hardship or safety.

appointment, that he "forget[s] to do stuff all the time." (Exh. 3F, 3 / Tr. 287) Plaintiff's ability to manage his financial affairs is neutral.[11]

### D. Remand Is Warranted For Further Development Of The Record

Because there is inconsistent evidence regarding Plaintiff's intellectual functioning, the weighing of that evidence and application to Listing 12.05C is properly left to the ALJ. However, the Court's substantial evidence review is frustrated by the fact that neither Dr. Selser nor the ALJ speak to the findings made in 2004 versus in 2009, particularly, with respect to how that might affect any finding as to onset of impairment. On remand, the ALJ will have the opportunity to consider the discrepancy in the IQ testing as well as the different diagnoses rendered by Dr. Welser. *See* Hancock, 667 F.3d at 474 ("This circuit permits an ALJ to weigh conflicting IQ test results....") (*citing* Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir.1987)); *see also* Norris, 2008 WL 4911794, *3 and n. 3 (ALJ considered multiple IQ scores and likelihood of reconciliation with other relevant evidence in support of borderline diagnosis, including examiner's suspicion that claimant was malingering when lower IQ scores were reflected).

In addition, if not previously provided, the ALJ will have the opportunity to review the limited school information submitted by Plaintiff.[12] *See e.g.*, Jackson, 2012 WL 580239, *3 (remand for review of school record, which is "***directly material to the final prong of Listing 12.05C*** – the question of whether Jackson suffered "significantly subaverage general intellectual

---

[11] Following the initial round of testing, which generated slightly higher IQ scores, Dr. Welser opined that Plaintiff "is not able to manage his own financial affairs competently at this point and would require a payee to help him manage his funds should they be awarded." (Exh. 1F, 6 / Tr. 269) In 2009, Dr. Welser stated that Plaintiff "should be able to manage his own financial affairs competently at this point but might require a payee to help him manage his funds and monitor his progress initially...." (Exh. 3F, 5 / Tr. 289)

[12] It is not clear from the record whether the ALJ had *any* school record to consider along with the claimant's testimony. The dates on the school information produced by Plaintiff's counsel reflect that the report card was faxed to counsel on 9-22-2010 and the correspondence from Texas is dated 8-27-2010. (Tr. 257-59) The ALJ's decision is dated August 20, 2010. (Tr. 22)

functioning with deficits in adaptive behavior initially manifested during the developmental period ... before age 22.")[13]

### E. The Magistrate Judge Did Not Engage In A *De Novo* Review Of The Evidence

Plaintiff contends that the Magistrate Judge erred in applying a *de novo* standard of review by improperly weighing certain evidence and by relying on information beyond that relied upon by the ALJ. More specifically, Plaintiff argues it was improper, or beyond the scope of a substantial evidence review, for the Magistrate Judge to refer to Plaintiff's ability to engage in certain activities where this evidence was not expressly mentioned by the ALJ at Step Three of the evaluation process (and in connection with the second §12.05C criteria). Plaintiff is mistaken. The evidence cited by the Magistrate Judge was, in fact, summarized and relied upon by the ALJ as one of several underlying bases for the denial of benefits. (M & R, 9) (*citing* Tr. 15-16, 19-20) The Magistrate Judge merely recited evidence *within the record* bearing upon adaptive functioning. In doing so, the Magistrate Judge did not improperly weigh the evidence or engage in a *de novo* review.

### III.

After an independent review of the Memorandum and Recommendation, Plaintiff's Objections, the Commissioner's Reply, and a *de novo* review of the entire record, the Court concludes that the requisite substantial evidence review is frustrated by the ALJ's failure to

---

[13] In Jackson, the Fourth Circuit reversed and remanded a Listing 12.05C case for re-evaluation of new and material evidence, *i.e.*, claimant's childhood school records. The ALJ had denied benefits claiming there was no evidence to support the "deficits-in-adaptive-behavior requirement." Jackson, 2012 WL 580239, *3. Although the Fourth Circuit did not decide whether Jackson was entitled to benefits, the panel commented that Jackson submitted evidence of "deficiencies in the areas of functional academic skills, social / interpersonal skills and communication, self-care, safety, and health." Jackson, 2012 WL 580239, *3. With respect to functional academic skills, the panel specifically noted that Jackson was in special needs classes, dropped out of school in the tenth grade, was unable to obtain her GED, read at a sixth-grade level, and that her evaluation revealed that her cognitive functioning was within the "mildly mentally retarded range of intellectual functioning." Jackson, 2012 WL 580239, *3.

recognize and discuss the inconsistent IQ evidence and the competing diagnoses given by Dr. Welser in 2004 and 2009. Accordingly, remand is appropriate under sentence four of 42 U.S.C. §405(g) for purposes of making additional findings and / or reconsideration of the record in light of the guidance provided herein.

    **IT IS, THEREFORE, ORDERED** that the Defendant-Commissioner's Motion for Summary Judgment is hereby **DENIED** and Plaintiff's Motion for Summary Judgment is **GRANTED in part and DENIED in part.**

    **IT IS FURTHER ORDERED** that this matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Memorandum and Order.

Signed: May 23, 2012

Richard L. Voorhees
United States District Judge